Submitted May 29, 2014; products liability claim against defendant Deere reversed and remanded, otherwise affirmed October 5, 2016; petition for review denied February 17, 2017 (361 Or 100)

Dwight G. PURDY,
Conservator for
Isabelle Eve Norton, a Minor,
*Plaintiff-Appellant,*

*v.*

DEERE AND COMPANY,
a foreign corporation; and
Ramsey-Waite Co., a corporation,
*Defendants-Respondents.*

Lane County Circuit Court
160800466; A144265

386 P3d 2

Kathryn H. Clarke and Don Corson filed the briefs for appellant.

Michael T. Garone, Jeffrey S. Eden, Schwabe, Williamson & Wyatt, P.C., Emilie Edling, and Bullivant Houser Bailey filed the briefs for respondents.

Before Lagesen, Presiding Judge, and Hadlock, Chief Judge, and Schuman, Senior Judge.

**LAGESEN, J.**

This is an action for products liability and negligence that previously was before us. *Purdy v. Deere and Company*, 252 Or App 635, 287 P3d 1281 (2012) (*Purdy I*). We affirmed, concluding that one of plaintiff's 10 assignments of error lacked merit, and that, as to the remaining nine, the parties' use of a general verdict form made it impossible to know whether any of the alleged errors substantially affected plaintiff's rights, as required by ORS 19.415 as a predicate for reversal. In so doing, we relied primarily on *Lyons v. Walsh & Sons Trucking Co., Ltd.*, 337 Or 319, 96 P3d 1215 (2004). *Purdy I*, 252 Or App at 642. On review, the Supreme Court overruled *Lyons*, concluding that, contrary to the holding in that case, a verdict form is not dispositive on whether an alleged error affects a party's substantial rights, and that the statute requires a whole record assessment to determine whether an error substantially affected a party's rights. *Purdy v. Deere and Company*, 355 Or 204, 226-32, 324 P3d 455 (2014) (*Purdy II*). If that assessment reveals that there is "some or a significant likelihood that the error influenced the result," then reversal is required. *Id.* at 226 (internal quotation marks omitted). The court then remanded to us "to consider plaintiff's remaining assignments of error," and to determine whether, if any of the assignments of error have merit, "the error substantially affected plaintiff's rights." *Id.* at 233.

We turn to that task. For the reasons stated below, we conclude that the trial court made three errors in instructing the jury regarding the law on plaintiff's products liability claim, and that there is "some likelihood" that those errors influenced the result as to that claim. For that reason, we reverse and remand for a new trial on plaintiff's products liability claim against defendant Deere and Company, but affirm the judgment as to plaintiff's negligence claims.

## I.  BACKGROUND

A.  *Applicable Law Governing Products Liability Claims*

The issues on appeal pertain primarily to plaintiff's products liability claim. To give context to the parties' theories of the case and those issues, we first provide an

overview of the law governing products liability claims in Oregon.

ORS 30.920, which is drawn from the *Restatement (Second) of Torts* section 402A (1965), governs products liability claims in Oregon. *See* ORS 30.920(3). It provides, in relevant part:

"(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a)   The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b)   The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2)   The rule stated in subsection (1) of this section shall apply, even though:

"(a)   The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b)   The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor."

To establish that a product is "in a defective condition unreasonably dangerous" within the meaning of ORS 30.920(1), a plaintiff must satisfy a two-part test known as the "consumer expectations" test. That test's elements are (1) "'at the time it leaves the seller's hands, the product is in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him'" and (2) "'the product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *McCathern v. Toyota Motor Corp.*, 332 Or 59, 77-78, 23 P3d 320 (2001) (quoting *Restatement* § 402A comment g, i) (brackets omitted). The legislature has placed the burden of proof on a plaintiff to show that the consumer expectations test is satisfied. Under ORS 30.910, "[i]t is a disputable presumption in a products liability civil action

that a product as manufactured and sold or leased is not unreasonably dangerous for its intended use." ORS 30.910. It is, thus, up to a plaintiff to prove otherwise by a preponderance of the evidence. OEC 308 ("In civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving the nonexistence of the presumed fact is more probable than its existence.").

Sometimes a product, and the circumstances surrounding the injury resulting from it, will be such that the average juror, from personal experience, will have the capacity to evaluate whether the danger posed by the product is beyond that which an ordinary consumer would contemplate. Other times, however, a product or the circumstances leading to the injury may not be within the experience of the average person. Under the Supreme Court's decision in *McCathern*, in such a case, one way a plaintiff can seek to prove that a product is more dangerous than an "ordinary consumer" would expect is through evidence that the extent of the risk posed by the product outweighs its utility, often "by proving that a safer design alternative was both practicable and feasible." 332 Or at 78. As we understand the court's reasoning in *McCathern*, such evidence is relevant to the assessment of what an ordinary consumer would expect of a product because a reasonable factfinder can infer that the ordinary consumer would expect the safer design, if that design is both practicable and feasible. *Id.* at 78-80 (noting that a product "user has [the] right to expect reasonably safe design" (internal quotation marks and citation omitted)). "It is the trial court's role * * * to ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect." *Id.* at 77.

In addition to proving that a product was "in a defective condition unreasonably dangerous," a plaintiff must prove that the dangerous and defective condition caused the plaintiff to suffer harm, either to person or property. ORS 30.920(1); *McCathern*, 332 Or at 81-82. Although both ORS 30.920 and *Restatement* section 402A speak in terms of a product's danger to a "user or consumer," a nonuser or nonconsumer injured by an unreasonably dangerous defective product also is entitled to pursue a products liability claim

under ORS 30.920 under *Osborne v. International Harvester Co.*, 69 Or App 629, 639-40, 688 P2d 390 (1984). There, we held that, under ORS 30.920, "the doctrine of strict product liability extends to bystanders injured as a result of unreasonably dangerous products." *Id.*

Finally, under Oregon law, a product user's "incidental carelessness or negligent failure to discover or guard against a product defect is not an appropriate defense to [a] products liability action for injuries suffered because of the product defect." *Hernandez v. Barbo Machinery Co.*, 327 Or 99, 109, 957 P2d 147 (1998). That principle derives from comment n to *Restatement* section 402A. Comment n explains that "contributory negligence" that "consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence" is not a "defense" in a products liability action. *Restatement* § 402A comment n. Although Oregon tort law now recognizes comparative fault, rather than contributory negligence, the principle that negligence in the form of "incidental carelessness or failure to discover or guard against a product defect" is not a "defense" in a products liability action remains a part of Oregon law. *Hernandez*, 327 Or at 109. It is typically implemented by instructing the jury that that type of negligence by the user of a product cannot be taken into account by the jury in allocating "fault" for a particular injury. *See id.*

B. *This Case*

Plaintiff is the conservator for Isabelle Norton. When Isabelle was two years old, her father, Kirk Norton, accidentally backed over her while mowing his lawn using a riding lawn mower—the L120D—manufactured by defendant Deere and Company and purchased from defendant Ramsey-Waite Co. Before backing up, Norton had pushed the "Reverse Implement Option" or "RIO" button on the dashboard control panel of the lawn tractor, so that the mower blades would remain engaged as he backed up. Isabelle suffered serious injuries that resulted in the amputation of her leg.

Plaintiff then filed this action against Deere and Ramsey-Waite on behalf of Isabelle. The complaint alleged claims for both strict liability and negligence. Specifically, it

alleged that the lawnmower was defective and unreasonably dangerous or had been negligently designed and marketed in three respects: (1) in light of the RIO design, the machine had mowing blades that could be engaged and rotating while being driven in reverse; (2) the button that permitted the blades to be engaged and rotating while being driven in reverse—the RIO button—was located on the front of the machine, rather than on the rear; and (3) the machine did not come with adequate instructions on the safe operation of a lawn mower with blades that could be engaged and rotating while being driven in reverse.

Defendants responded that the damages alleged were caused, not by a defective or negligently designed product, but from the acts or omissions of Kirk Norton, and his wife, Shawna Norton. Specifically, defendants asserted that those acts or omissions included, but were not limited to, the Nortons' failure to supervise their daughter and to keep a proper lookout. Defendants did not assert the Nortons' negligence as an affirmative defense, but notified the court of their intention to use evidence of the couple's alleged negligence to rebut plaintiff's proof of causation.[1]

The case was tried to a jury. As developed at trial, plaintiff's theory of the case was that Deere designed and marketed a defective and unreasonably dangerous lawnmower, and that both Deere and Ramsey-Waite negligently failed to provide Kirk Norton with adequate warnings and instructions regarding reverse operation. With respect to his strict liability claim, plaintiff's theory was that Deere's L120D lawnmower was defective and unreasonably dangerous to an extent beyond that which would be contemplated by the ordinary consumer, because not only (1) did the *existence* of the RIO button allow the mowing blades to

---

[1] At trial, defendants argued that ORS 31.600(5), Oregon's comparative fault statute, permits a defendant to put on evidence of the acts or omissions of nonparties—in order to rebut a plaintiff's proof of causation—without pleading and proving those nonparties' fault as an affirmative defense. That statute provides, in relevant part:

"This section does not prevent a party from alleging that the party was not at fault in the matter because the injury or death was the sole and exclusive fault of a person who is not a party in the matter."

ORS 31.600(5). The trial court agreed with defendants on that point.

be engaged and rotating while driven in reverse, but also (2) the *placement* of that button on the dashboard permitted the operator to mow in reverse with the blades engaged without turning around fully to ensure that the path of reverse travel was clear. Plaintiff characterized this second alleged defect as a "visibility defect," and presented evidence at trial—in the form of testimony from Johnson, an engineer—that an ordinary user of the mower would not understand how large the mower's blind spot was, and would not understand that turning to one side or the other to check behind the mower was not sufficient to see behind the mower.

Plaintiff sought to prove his case primarily (if not entirely) through risk-utility evidence that three safer design alternatives that were both practicable and feasible: (1) a "no-mow-in-reverse" model, in which the mower blade would shut down when the operator initiated reverse travel; (2) a "zero-turn-radius" model, in which a tight turning radius would eliminate the need for reverse travel, thereby overcoming both alleged defects in the product; and (3) a modified RIO model, in which the RIO button was placed behind the seat, rather than on the dashboard, thereby forcing the user to turn around fully in order to overcome the alleged "visibility defect." Plaintiff's theory was that each of those designs would have prevented the injury to Isabelle, either by ensuring that the mower blades were not engaged while the mower was in reverse, by eliminating the "visibility defect," or by eliminating both defects.

Defendant Deere's theory was that the lawnmower was not, in fact, defective or unreasonably dangerous, because ordinary consumers are well aware of the risks inherent in riding lawnmowers, and Deere had taken all reasonable steps to ensure the safety of the product. Deere argued that its mower design, which required a mower operator to make an affirmative choice to push the RIO button in order to move in reverse with the blades engaged, reasonably safeguarded against a user accidentally backing up with the blades engaged. Deere also argued that materials provided with the mower adequately apprised users of the risk of injuries such as those suffered by Isabelle, and also

adequately informed users about how to avoid them. Deere pointed out that the warning label on the mower stated:

"DANGER:

"ROTATING BLADES CUT OFF ARMS AND LEGS[.]

"Do not mow when children or others are around.

"Do not mow in reverse.

"Look down and behind before and while backing.

"Never carry children even with the blades off."

An additional warning label on the mower dashboard depicts a child being run over by a lawn mower. The mower's instruction manual, which Norton admitted that he had received but declined to read, also cataloged the dangers of reversing the mower with blades engaged, explaining, among other things:

"Tragic accidents with children can occur if the operator is not alert to the presence of children, especially when a child approaches a machine from behind. Before and while backing up, stop mower blades and look down and behind the machine carefully, especially for children."

Apart from contending that the lawn mower was not defective, consistent with their pleadings, both defendants also challenged causation in two ways. First, defendants contended that Kirk Norton's negligence, rather than any product defect or negligence on the part of defendants, was the sole cause of the injuries to Isabelle. Second, defendants argued that plaintiff could not prove causation, because Isabelle Norton would have been injured even if Kirk Norton had *not* pressed the RIO button; specifically, defendants argued and presented evidence that, even though the blades would have automatically shut down in the absence of Norton's decision to push the RIO button, they would have continued to move by momentum at the time that Isabelle came into contact with the machine, thereby injuring her in the same way that she was injured.

After a 13-day trial, the trial court instructed the jury. In doing so, it delivered three instructions that are now the subject of this appeal.

First, in instructing the jury on what plaintiff had to prove in order to establish that the lawn mower was defective, the court told the jury:

"I will now instruct you on the law of strict liability for a defective product. A defendant is liable for harm caused by the product if, one, the defendant was engaged in the business or manufacturing, distributing or selling the product; and two, the product was in a defective condition that was unreasonably dangerous to the plaintiff when the product left the defendant's hands; and three, the product was intended to and did reach the user without substantial change in which it was manufactured, distributed or sold.

"By defective condition, it is meant that at the time the product left the hands of the manufacturer, distributor, or seller, it was in a condition that was not contemplated by the ultimate user and was unreasonably dangerous to the ultimate user. *Such manufacturer, distributor, or seller is not liable when it delivers the product in a safe condition and subsequent mishandling or other causes make it harmful by the time it was used.*"

(Emphasis added.)

Plaintiff objected to the italicized sentence on the ground that it was unnecessary and redundant to the extent that it instructed the jury that a manufacturer, seller, or distributor would not be liable if the product was "safe," and on the ground that it was confusing and incomplete to the extent that it raised the issue of "mishandling" and other causes. In particular, plaintiff contended that, if the jury was to be instructed regarding "mishandling" as a cause, then it should also be instructed on the longstanding principle, acknowledged in *Hernandez*, that "incidental carelessness or negligent failure to discover or guard against a product defect is not an appropriate defense to [a] products liability action for injuries suffered because of the product defect." 327 Or at 109. Based on *Hernandez*, plaintiff proposed that the trial court instruct the jury as follows, if it opted to deliver the contested sentence on mishandling:

"In a product liability action, you may consider a non-party's conduct which was a cause of the claimed injury and constituted fault for that injury, unless the non-party's

alleged negligence consists in the kind of unobservant, inattentive, ignorant or awkward failure to discover or guard against the defect that goes toward making the product dangerously defective in the first place."

The trial court disagreed with plaintiff and, as noted, delivered Deere's instruction regarding mishandling, but did not deliver plaintiff's requested instruction or otherwise explain to the jury how any negligence on the part of Norton should be taken into account.

Second, the trial court delivered Deere's requested instruction on the presumption created by ORS 30.910,[2] telling the jury, "The law assumes that at the time a product is manufactured and sold, it was reasonably safe for its intended use." The court did so over plaintiff's objection that it was not appropriate to instruct the jury on a presumption, but, rather, the proper course for the court was to instruct the jury on plaintiff's burden of proof with respect to the fact implicated by the statutory presumption.

Third, in instructing the jury regarding its consideration of plaintiff's risk-utility evidence, the court explained:

"When determining whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, you may consider evidence that the product's risks outweigh its utility.

"When determining whether a product's risks outweigh its utility, you may consider evidence whether a safer design alternative was both practical and feasible.

"In considering whether an alternative design is both practical and safer than the design at issue, you may consider whether the alternative design would have increased the overall safety and utility of the subject product, not just the safety of the product as it regards the type of injury in this case."

The court did so over plaintiff's objection to the last paragraph of that instruction, which plaintiff contended was

---

[2] ORS 30.910 states, "It is a disputable presumption in a products liability civil action that a product as manufactured and sold or leased is not unreasonably dangerous for its intended use."

substantively incorrect and also precluded by Supreme Court cases stating that the jury should not be instructed in that manner.

After instructing the jury, the court submitted a verdict form to the jury that asked the following three questions:

> "1. Was Defendant Deere & Company's lawn mower/ tractor defective and unreasonably dangerous in one or more of the ways alleged by Plaintiff and, if so, was that a cause of injury or damage to Isabelle Norton?
>
> "2. Was Defendant Deere & Company negligent in one or more of the ways alleged by Plaintiff, and, if so, was that a cause of injury or damage to Isabelle Norton?
>
> "3. Was Defendant Ramsey-Waite negligent in one or more of the ways alleged by Plaintiff, and, if so, was that a cause of injury or damage to Isabelle Norton?"

*Purdy*, 355 Or at 207. The jury answered "no" to each of the three questions by a vote of nine to three on each question, and the trial court entered a general judgment for defendants as to all claims.

Plaintiff has appealed, raising 10 assignments of error. Among other things, plaintiff challenges the trial court's decision to instruct the jury regarding "mishandling" without also informing the jury of the type of user negligence that cannot be considered in a products liability case; the trial court's decision to instruct the jury regarding the ORS 30.910 presumption; and the trial court's decision to instruct the jury that, in evaluating whether the proposed alternative designs were practicable and feasible, it could "consider whether the alternative design would have increased the overall safety and utility of the product." Plaintiff also raises a number of alleged evidentiary errors. Deere cross-assigns error to the trial court's denial of its motion for a directed verdict on plaintiff's products liability claim as to Deere, to the trial court's decision to permit plaintiff to introduce risk-utility evidence, and to the trial court's decision to permit plaintiff's "human factors" expert to testify.

## II. ANALYSIS

We start with plaintiff's claims of instructional error. Those claims, in the main, challenge the trial court's decision to deliver certain instructions regarding plaintiff's products liability claim against Deere.[3] We review a contested jury instruction that the trial court delivered to determine whether it correctly stated the law applicable to the case and, if not, whether any error in giving the instruction was prejudicial to the party opposing the instruction. *Wallach v. Allstate Ins. Co.*, 344 Or 314, 318-22, 180 P3d 19 (2008). A jury instruction must be both (1) complete and (2) accurate. *Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 454, 235 P3d 668 (2010). "For appellate courts reviewing claims of instructional error, the touchstones are legal accuracy and clarity[.]" *Id.* As the Supreme Court has explained:

> "The parties to any jury case are entitled to have the jury instructed in the law which governs the case in plain, clear, simple language. The objective of the mold, framework and language of [jury] instructions should be to enlighten and acquaint the jury with the applicable law. Everything which is reasonably capable of confusing or misleading the jury should be avoided. Instructions which mislead or confuse are ground for reversal or a new trial."

*Williams et al. v. Portland Gen. Elec.*, 195 Or 597, 610, 247 P2d 494 (1952).

### A. Instruction Regarding Mishandling

Plaintiff's seventh and eighth assignments of error challenge the trial court's decisions regarding the mishandling instruction. As he did below, plaintiff argues that the "mishandling" instruction on its own could have misled the jury into thinking that *any* negligent conduct on the part of Kirk Norton would preclude Deere's liability on the products liability claim, even if the jury were to find that the lawn mower was defective in one of the ways alleged by plaintiff.

---

[3] The claims of instructional error pertain to the products liability claim against Deere, and do not pertain to the negligence claims, one of which was against defendant Ramsey-Waite. For that reason, we refer solely to defendant Deere in discussing the alleged instructional errors.

Plaintiff further contends that there is evidence in the record that would permit a jury to find that any negligence on the part of Norton was of the type that cannot provide a defense in a products liability action, that is, the negligent failure to discover or guard against the mower's alleged defects. In particular, plaintiff points out that one of his theories was that the mower had a "visibility defect" in that operators would not realize that they could not see behind them without actually turning fully around. Plaintiff points out further that the evidence shows that Norton looked to the side before reversing the mower, and suggests that, from that evidence, a factfinder could infer that Norton's negligence was a simple failure to discover or guard against the fact that he would not be able to see behind the mower without turning around fully. In light of defendants' focus on Kirk Norton's conduct as the cause of Isabelle's injuries, plaintiff contends that the challenged instruction gives rise to some likelihood that the jury mistakenly thought Kirk Norton's negligence would defeat any liability on the part of defendants, even if that negligence was of the type that *Hernandez* holds is not a "defense" in a products liability action.

In response, Deere contends that the trial court did not err by delivering its requested instruction regarding "mishandling." Deere points out that the instruction is a correct statement of the law because it is derived from comment g to the *Restatement* section 402A, which Oregon has adopted. ORS 30.920(3).[4] Also, according to Deere, the instruction was approved by the Supreme Court in *Wulff v. Sprouse-Reitz Co., Inc.*, 262 Or 293, 301, 498 P2d 766 (1972), and Deere was entitled to its delivery because it was supported by the evidence of Norton's conduct and "clarified other instructions by providing an example—consistent with [d]efendant['s] theory—of a situation in which [d]efendant[] would not be liable."[5] As to whether the trial court was required also to

---

[4] ORS 30.920(3) states in relevant part:

"It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)."

[5] We note that *Wulff* quoted the instruction at issue, but did not address the issue presented in this case, which is whether that instruction represents an incomplete instruction on the law. 262 Or at 301. In other words, nothing in *Wulff*

deliver plaintiff's requested *Hernandez* instruction, Deere contends that that instruction is relevant and appropriate only in a case in which comparative fault is at issue. Therefore, Deere reasons, the instruction was not appropriate in this case, in which neither party had asked that the jury assess Norton's comparative fault. Alternatively, Deere argues, the evidence at trial did not support the giving of the instruction because Norton testified that he knew both that backing up with the mower blades engaged risked serious injury to any person behind the mower and that he needed to check the area behind the mower before backing up. That testimony, Deere asserts, would preclude a finding that any negligence on the part of Norton was the sort addressed by the *Hernandez* instruction.

We conclude that the trial court erred by delivering the instruction under the circumstances of this case. Although the instruction was a correct statement of the law, it was not a complete one. Kirk Norton's negligence played a central role in Deere's theory of the case; Deere attributed the accident to him and his decisions to mow the lawn while his children were not supervised by an adult and to mow in reverse without looking all the way behind him. Although the instruction told the jury how to take the evidence of that negligence into account if it thought that the mower was safe, it failed to explain to the jury how to take that evidence into account if the jury found that the product was defective and dangerous, leaving a significant gap for the jury to fill. And, "[w]here an instruction is necessary to inform the jury of the parameters that it must apply in considering particular evidence, an instruction that does not completely and accurately describe those parameters is erroneous and objectionable, even if the omitted portion of those parameters would benefit the opposing party." *Schwarz*, 348 Or at 455. In other words, *if* the trial court was going to instruct the jury as to how it should take into account any negligence or "mishandling" by Kirk Norton, *then* it should have done so completely, by explaining how (if at all) it bore on the jury's decision if the jury found that the mower was not

suggests one way or another whether it was proper to deliver the instruction under the circumstances of this case.

defective, and how it bore on the jury's decision if the jury found that the mower was defective.

Deere advances two arguments as to why it was unnecessary to instruct the jury on the principle that "incidental carelessness or negligent failure to discover or guard against a product defect is not an appropriate defense to [a] products liability action for injuries suffered because of the product defect." *Hernandez*, 327 Or at 109. First, Deere argues that the principle is only relevant in a case in which comparative fault is asserted as a defense. Second, Deere argues that a factfinder would not be permitted to find that Kirk Norton's negligence was the type of carelessness that cannot be considered in a products liability action.

We disagree that the principle that "incidental carelessness or negligent failure to discover or guard against a product defect is not an appropriate defense to [a] products liability action for injuries suffered because of the product defect" comes into play solely in a case in which comparative fault is alleged as a defense. As explained, although defendants did not assert a comparative fault defense to any of plaintiff's claims, they did invoke ORS 31.600(5) to argue that the injuries to Isabelle were the "sole and exclusive fault" of Kirk Norton, that is, that Kirk Norton's negligence was the cause of Isabelle's injuries, rather than any conduct on the part of defendants or defects in Deere's product. We think it follows from *Hernandez* and longstanding Oregon law that, if a factfinder is not permitted to consider "incidental carelessness or negligent failure to discover or guard against a product defect" in assigning fault for comparative fault purposes, it also is not appropriate for the factfinder to consider that type of negligence in assessing whether a person is solely and exclusively at fault under ORS 31.600(5).[6] In other words, we understand *Hernandez* to mean that

---

[6] At least one other court has reached a similar conclusion. *See Eshbach v. W.T. Grant's & Co.*, 481 F2d 940 (3d Cir 1973) (concluding that trial court erred when it permitted jury to consider evidence of lawn mower operator's negligence in product defect case for injury to daughter without instructing the jury that, under Pennsylvania law, such negligence could not be considered as an intervening cause so as to relieve the defendant of liability unless negligence was of the "extraordinary" type that can constitute an intervening cause; failure to provide such an instruction "had the obvious capacity of suggesting to the jury that [the operator] alone was responsible for his daughter's injuries").

it is not appropriate for the factfinder to take that type of negligence by a product's user into account when assessing whether a defective product is responsible for an injury that resulted from the use of the product.

As to Deere's second argument—that there was no evidence from which a factfinder could find that Norton's negligence was the sort of "incidental carelessness" addressed in *Hernandez*, we also disagree. At least with respect to the alleged "visibility defect," a factfinder could permissibly infer that Norton's negligence was in failing to apprehend the extent of the mower's blind spot and, in particular, in failing to recognize that, to check behind the mower, he was required to rotate fully in his seat, rather than simply checking to the side (which Norton testified that he did). In other words, a factfinder could find that Norton's negligence was in failing to "guard against" the product's visibility defect, were the factfinder to find that the product was, in fact, defective in that manner.

In short, Deere's "mishandling" instruction did not provide a complete statement of the law applicable to this case, in light of the evidence at trial and the parties' theories of the case. The trial court erred by delivering it.[7]

B. *Instruction On The Disputable Presumption Created By ORS 30.910*

Plaintiff's ninth assignment of error challenges the trial court's decision to instruct the jury regarding the presumption created by ORS 30.910. That statute provides, "It is a disputable presumption in a products liability civil action that a product as manufactured and sold or leased is not unreasonably dangerous for its intended use." ORS 30.910. Relying on that statute, the trial court, on Deere's request, instructed the jury that "[t]he law assumes that at the time a product is manufactured and sold, it was reasonably safe for its intended use."

---

[7] In the light of our conclusion that the trial court erred in delivering the "mishandling" instruction because it was not complete, we do not address whether plaintiff's proposed instruction was the correct way to complete the instruction. The parties are free on remand to submit competing alternatives, or to not submit the issue of mishandling to the jury at all.

On appeal, plaintiff does not dispute that the instruction correctly stated the law under ORS 30.910, or that the principle reflected in ORS 30.910 is applicable to this case. Rather, plaintiff contends that the court's instruction on the burden of proof—which told the jury that "[p]laintiff bears the burden of proof in all issues in this case"—adequately covered the subject matter and effect of the ORS 30.910 presumption, and that the court's additional instruction, in context, skewed the case against him by, in effect, instructing the jury that "the law assumes [plaintiff] is wrong." Plaintiff also points to the legislative commentary to OEC 308, which indicates that the legislature intended that juries in civil cases in Oregon would not be instructed on presumptions but, instead, would be instructed in terms of what party has the burden of proof as to a particular fact, in the light of a particular presumption.

In response, Deere points out that plaintiff does not contest that the instruction correctly stated the presumption under ORS 30.910, and argues that it has long been the law in Oregon that a party is entitled to a jury instruction on applicable evidentiary presumptions, citing *Simpson v. Sisters of Charity of Providence*, 284 Or 547, 562, 588 P2d 4 (1978) (holding that "[p]arties are entitled to instructions on the existence and effect of presumptions"). Therefore, Deere reasons, the trial court did not err by delivering the requested instruction.

Deere would be right, if this case had been tried before the enactment of OEC 308.[8] However, in enacting OEC 308, the legislature altered Oregon practice with respect to evidentiary presumptions, including the practice of instructing juries on the existence and effect of presumptions. Specifically, the legislature intended to replace the practice of instructing juries directly about presumptions with the practice of instructing juries in terms of what effect an applicable presumption has on the burden of proof, without reference to the presumption itself. *Riley Hill General*

---

[8] OEC 308 states:

"In civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

*Contractor v. Tandy Corp.*, 303 Or 390, 408 n 9, 737 P2d 595 (1987) (explaining effect of OEC 308). As the commentary to the provision explains:

"Under OEC 308, once a party invoking a presumption establishes the basic facts giving rise to it, the burden of establishing the nonexistence of the presumed fact shifts to the opposing party. Plaintiff, for example, may raise the presumption that a letter duly addressed and mailed was received in the regular course of the mail. The judge in such a case would determine whether the evidence is sufficient to support a finding of the existence of the basic facts: that the letter was properly addressed, that it was mailed, and that it was not returned. If so, the judge would instruct the jury that if they find the basic facts to be true, then the burden is on defendant to prove by a preponderance of the evidence that the letter was *not* received. The jury should never hear the word 'presumption' during this instruction.

"* * * * *

"The Legislative Assembly decided to change Oregon practice on presumptions for several reasons. First, it is extremely difficult to phrase a jury instruction without conveying the impression that the presumption itself is evidence. That proposition has long been discredited. Second, under the current approach to presumptions, the jury must weigh the force of the legal conclusion mandated by the presumption against the testimony of witnesses and other direct evidence. That is a difficult or impossible task. Finally, the considerations of fairness, policy and probability, which underlie the creation of presumptions, are not satisfied by giving them any lesser effect.

"The approach set forth in this rule is simple and workable, and gives due consideration to the policies behind the creation of presumptions. All presumptions, whether legislatively or judicially created, must be treated in the manner prescribed by this section."

1981 Conference Committee Commentary to OEC 308 (internal citations omitted). The Supreme Court has held that courts should give effect to that legislative intention, explaining that, under OEC 308, a jury should not be instructed on a presumption, or on any need to overcome one by evidence, and that "[i]n a properly tried civil case, the

term 'presumption' should not be heard by the jury." *Riley Hill*, 303 Or at 408 n 9.

It follows from OEC 308 and *Riley Hill* that the trial court erred by instructing the jury on the presumption created by ORS 30.910 in the way that it did. Although the court phrased its instruction in terms of an "assumption" rather than a "presumption," employing the word "assumes" instead of the word "presumes," the court's use of a synonym for "presume" does not save the instruction. Under OEC 308 and *Riley Hill*, the court should have given effect to the ORS 30.910 presumption by instructing the jury on the burden of proof—that is, that plaintiff had the burden to prove by a preponderance of the evidence that the mower was unreasonably dangerous for its intended use—and left it at that.

C.  *Instruction On Evaluation Of Risk-Utility Evidence*

Plaintiff's tenth assignment of error challenges a portion of the jury instruction addressing the jury's consideration of his risk-utility evidence of a defective design. Over Deere's objection, the trial court permitted plaintiff to introduce that risk-utility evidence, and then instructed the jury as follows:

> "When determining whether a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer, you may consider evidence that the product's risks outweigh its utility.

> "When determining whether a products risks outweigh its utility, you may consider evidence whether a safer design alternative was both practical and feasible.

> "In considering whether an alternative design is both practical and safer than the design at issue, you may consider whether the alternative design would have increased the overall safety and utility of the product, not just the safety of the product as it regards the type of injury in this case."

Plaintiff contends that the trial court erred in giving the third paragraph of that instruction. Plaintiff points out that Deere predicated the requested sentence on the Supreme Court's decisions in *Phillips v. Kimwood Machine Co.*, 269 Or 485, 525 P2d 1033 (1974), and *Wilson v. Piper*

*Aircraft Corporation*, 282 Or 61, 577 P2d 322 (1978). In those decisions, the Supreme Court identified certain factors that should govern a trial court's assessment of whether the evidence is sufficient to permit a jury to find that the risk of a product outweighs its utility.[9] In setting forth those factors, the court explained that those factors governed *the court's* evaluation of the sufficiency of the plaintiff's risk-utility evidence, and did not supply a basis for instructing *the jury*. *Wilson*, 282 Or at 68 n 3; *Phillips*, 269 Or at 501. At the time, Oregon adhered to the "reasonable manufacturer" test[10] for determining whether a product had a defective design; the court explained that the jury should be instructed only on the general "reasonable manufacturer" standard:

---

[9] Those factors are:

"(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

"(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

"(3) The availability of a substitute product which would meet the same need and not be as unsafe.

"(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

"(5) The user's ability to avoid danger by the exercise of care in the use of the product.

"(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

"(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."

*Phillips*, 269 Or at 499 n 13.

[10] Under the former "reasonable manufacturer" test, the question for a jury in a products liability action alleging the defective design of a product was "whether a reasonably prudent manufacturer would have so designed and sold the article in question had [it] known of the risk involved which injured plaintiff." *Phillips*, 269 Or at 494. In *McCathern*, the Supreme Court held that, in enacting ORS 30.920, the legislature "abrogated the reasonable manufacturer test," and mandated that the "consumer expectations test govern[] design defect cases in Oregon." 332 Or at 75-76. However, the court concluded further that the same sort of risk-utility evidence that had been relevant under the reasonable manufacture test remained probative under the consumer expectations test, and that a plaintiff could prove that a product was defective and unreasonably dangerous under that test by proving the existence of a safer design that was practicable and feasible. *Id.* at 77-79.

"[T]he factors * * * are not the bases for instructions to the jury but are for the use of the court in determining whether a case has been made out which is submissible to the jury. If such a case has been made out, then it is submitted to the jury for its determination under instructions as to what constitutes a 'dangerously defective' product, much in the same manner as negligence is submitted to the jury under the 'reasonable man' rule."

*Phillips*, 269 Or at 501.

Plaintiff argues· that the Supreme Court's directive in *Phillips* and *Wilson* that the jury not be instructed on the identified factors remains good law and that, consequently, the trial court erred by delivering the contested jury instruction. Plaintiff argues further that, even if *Phillips* and *Wilson* no longer preclude a trial court from instructing a jury on the specifics of risk-utility analysis, the trial court nonetheless erred by delivering the instruction because, in plaintiff's view, the instruction misstates the law because it suggests that plaintiff had an obligation to demonstrate that his proposed design alternatives "increased the overall safety" of the lawn mower.

Deere argues that the instruction correctly states the law. It argues further that the switch from the "reasonable manufacturer" test to the "consumer expectations" test has undermined the Supreme Court's holding that juries should not be instructed on the factors governing a trial court's assessment of whether a plaintiff's risk-utility evidence is sufficient to go to the jury.

On both scores, plaintiff is correct. Under *Phillips* and *Wilson*, the trial court erred in providing the challenged instruction to the jury. The Supreme Court has stated—twice—that the particular factors that govern a trial court's assessment of whether a plaintiff's evidence that there is an alternative product design that is safer, practicable, and feasible, do not supply the bases for jury instructions, and that the jury is to be instructed only under the applicable standard for assessing whether a product is in a dangerously defective condition. We recognize that the Supreme Court made those statements at a time when the "reasonable manufacture" test provided the legal standard for evaluating

whether a product was dangerously defective. However, the Supreme Court has not retreated from its clearly stated position that the factors that govern risk-utility analysis should not be used to instruct the jury, and we fail to see how the switch from the "reasonable manufacture" test to the "consumer expectations" test suggests that a different approach is warranted, absent an express change in course by the Supreme Court.

In addition, even if Deere is correct that the Supreme Court's directive regarding jury instructions in *Phillips* and *Wilson* is no longer good law, the instruction did not correctly state the law. Under *Wilson*, to make a case that there is a safer product design that is practicable and feasible, a plaintiff must present evidence that would permit the factfinder to find that the alternative design is "not only technically feasible, but also practicable in terms of cost and the overall design and operation of the product." 282 Or at 69. That requires evidence, not only of how the alternative design would alleviate the particular risk that led to the injury in question, but also of the proposed design's effect on "safety in [other] respects," cost, and performance. *Id.* at 70. Thus, while it is correct to say that the pertinent inquiry requires an examination of the *effect* of the proposed alternative design on a product's "overall safety," and "overall utility," and not just an examination of the design's effect on the particular risk that led to the injury, it is not correct to suggest that, to be practicable, a proposed design should *increase* the product's overall safety. Under *Wilson*, a factfinder could permissibly find that an alternative design was practicable with respect to safety if the evidence showed that the design eliminated the risk in question without *diminishing* the product's overall safety, even if the factfinder was unable to find that the design resulted in an *increase* in "overall safety" beyond the elimination of the particular risk.

Accordingly, it was wrong for the trial court to instruct the jury that "you may consider whether the alternative design would have increased the overall safety and utility of the product, not just the safety of the product as it regards the type of injury in this case." The instruction misleadingly suggested to the jury that it was pertinent for the

jury to look at whether the designs increased overall safety. In reality, the jury's task was different: to assess the alternative design's *effect* on overall safety, and to then take that effect into account in assessing whether the design was one that was practicable.

D.  *Did the errors affect plaintiff's substantial rights?*

We have concluded that the trial court delivered three jury instructions that should not have been delivered. The question is whether that error requires reversal. Under ORS 19.415(2), we are empowered to reverse on account of the error only if the error is one "substantially affecting" plaintiff's rights. As the Supreme Court explained in *Purdy II*, the question for us is "whether—in an important or essential manner—the error had a detrimental influence on a party's rights." 355 Or at 226. Answering that question requires us to conduct a review of the whole record to assess the likelihood that the error permitted the jury to reach an incorrect result. *Id.* at 228. If there is "little likelihood" that an error affected the verdict, we may not reverse; if there is some likelihood or a significant likelihood that the error influenced the jury's verdict, we must reverse. *Id.* at 226. As we have explained, since the Supreme Court's decision in this case, "[i]n the context of instructional error, that standard will generally be met if, 'when the instructions are considered as a whole in light of the evidence and the parties' theory of the case at trial[,] there is some likelihood that the jury reached a legally erroneous result.'" *Dosanjh v. Namaste Indian Restaurant, LLC*, 272 Or App 87, 92, 353 P3d 1243 (2015) (quoting *Purdy*, 355 Or at 232).

We are persuaded that that standard is met here. As an initial matter, the jury was given three different erroneous instructions on the products liability claim. That makes it at least somewhat likely that the jury misunderstood its task in evaluating plaintiff's products liability claim, creating some likelihood of an erroneous result. Plaintiff presented evidence from which a properly instructed jury could have found in his favor; the incorrect instructions gave rise to the risk that the jury may have rejected plaintiff's claims based on a misunderstanding of, or confusion about, the law,

rather than on a determination that plaintiff failed to prove his case.

More particularly, the instruction on the ORS 30.910 presumption gave rise to the risk of jury confusion as to what, exactly, its task was in determining whether the lawn mower was in an unreasonably dangerous defective condition. The jury was told that the "[t]he law assumes that at the time a product is manufactured and sold, it was reasonably safe for its intended use." However, the jury was not provided any explicit instruction on what plaintiff must do to overcome that "assumption." The court simply instructed the jury that "[p]laintiff bears the burden of proof in all issues in this case," but did not explain what that meant in terms of the law's "assumption" that the lawn mower was safe. The jury was left to guess how to balance evidence against the legal assumption. Under those circumstances, we think that there is "some likelihood" that the jury gave that assumption more weight in its assessment of the case than the legislature intended. As noted, eliminating the risk that the jury would misunderstand how to balance a legal presumption against evidence is one of the primary reasons that both the legislature and the Supreme Court have directed that, "[i]n a properly tried civil case, the term 'presumption' should not be heard by the jury." *Riley Hill*, 303 Or at 408 n 9.

As to the incomplete instruction on mishandling, that instruction, together with defendants' emphasis on Kirk Norton's conduct in their arguments to the jury, gave rise to the risk that the jury may have found the mower defective but nonetheless inappropriately determined that Norton's conduct was the sole cause of Isabelle's injuries, even if it would have determined, had it been asked, that that conduct consisted of "incidental carelessness or negligent failure to discover or guard against a product defect." *Hernandez*, 327 Or at 109. The fact that the trial court explicitly instructed the jury that, "if you find the conduct of the nonparty was the sole cause [of] an injury to the plaintiff, the defendant would not be liable for any injury" only increased that risk.

Finally, there is some likelihood that the court's instruction on the risk-utility evidence also led the jury to

reach an erroneous conclusion. Plaintiff presented evidence that would have permitted the jury to find that there were alternative designs that would have prevented the injury to Isabelle without diminishing product safety or utility in other respects. As contemplated by the Supreme Court in *McCathern*, such evidence would have permitted the jury to conclude that there were safer alternative designs that were both practicable and feasible, and that Deere's product, as a result, was more dangerous than the ordinary consumer would expect. *See* 332 Or at 77-78. The trial court's instruction created the risk that the jury would not reach that conclusion, based on the erroneous belief—advanced by the jury instruction—that a design should affirmatively increase overall safety and utility in order to be practicable.

For those reasons, under the Supreme Court's directive in *Purdy II*, those instructional errors require us to reverse the judgment as to the products liability claim against Deere.

E. *Evidentiary Errors*

We turn to plaintiff's claims of evidentiary error. We previously rejected plaintiff's sixth assignment of error, which challenged the trial court's decision to permit defendants' expert to testify, and we adhere to that ruling. *Purdy I*, 252 Or App at 645-46. As to the remaining assignments of evidentiary error, which challenge the trial court's exclusion of various types of evidence, although plaintiff argues that the alleged errors bear both on the negligence claims and on the products liability claim, plaintiff's arguments, in the main, address the alleged errors in the context of plaintiff's products liability claim. In any event, having reviewed the record, we reject those assignments of error without further written discussion as they pertain to the negligence claims. To the extent that the claims of error pertain to the products liability claim, we do not address them because the evidence may develop differently on remand.

F. *Cross-Assignments of Error*

We briefly address defendants' cross-assignments of error. In those cross-assignments, defendants assign error to (1) the trial court's denial of their motion for a directed

verdict on the products liability claim as to Deere; (2) the trial court's decision to admit plaintiff's risk-utility evidence; and (3) the trial court's decision to permit one of plaintiff's experts—Mills—to testify. We reject the first cross-assignment of error without written discussion. We decline to address the third cross-assignment of error because the evidence may develop differently on remand.

As to the second cross-assignment of error, we address it because we think it inevitable that it will arise on remand. In that cross-assignment of error, Deere argues that the trial court erred by permitting plaintiff to present risk-utility evidence. As noted, plaintiff's case was built almost entirely on such evidence; plaintiff sought to prove that the lawn mower was more dangerous than an "ordinary consumer" would contemplate by demonstrating that there were safer designs that were both practicable and feasible, in the manner contemplated by *McCathern*. Deere argues that there was "no need" to permit such evidence because, in its view, what an "ordinary consumer" would expect from the lawn mower at issue would be within the average juror's understanding. Alternatively, Deere argues that the evidence was not relevant because it did not show what actual consumers, in fact, expect from riding lawn mowers like the one at issue in this case.

As to the first point, *McCathern* imposes upon a trial court a gatekeeping role to ensure that the jury has adequate information to evaluate what an ordinary consumer would expect: "It is the trial court's role * * * to ensure that the evidence is sufficient for the jury to make an informed decision about what ordinary consumers expect." 332 Or at 77. That is a standard that gives a trial court a level of discretion to assess whether particular evidence will assist the jury in understanding its task under the consumer expectations test, and we think it appropriate to review the trial court's determination for abuse of discretion. Here, we conclude that the trial court did not abuse its discretion by admitting the risk-utility evidence to assist the jury in evaluating plaintiff's claim. The trial court could permissibly conclude that a riding lawn mower is not such a common product that the average juror would, from background and

experience alone, have the capacity to assess what ordinary consumers expect of such a product, thereby making the risk-utility evidence necessary to provide a foundation for the jury's assessment of plaintiff's claim.

As to the second point, although the reasoning in *McCathern* is not entirely clear, we understand the court to have held that risk-utility evidence—and, in particular, evidence of a safer alternative design that is practicable and feasible—is relevant to the consumer expectations test because it allows for an inference that the "ordinary consumer" would expect a manufacturer to design the product to be safe, if such a design is practicable and feasible. That proposition flows from the court's conclusion in *McCathern*, 332 Or at 80, that evidence of a safer design that was practicable and feasible was sufficient to sustain the plaintiff's burden of proving that an "ordinary consumer" would not have expected the vehicle at issue in that case to roll over in the way that it did. Accordingly, Deere's argument that risk-utility evidence must reflect what actual consumers expect in order to be relevant under the consumer expectations test is contrary to *McCathern*, and we reject it for that reason.

## III. CONCLUSION

We have concluded that the trial court erred in three respects in its instructions to the jury on the products liability claim, and that those errors require reversal of the judgment as to that claim against Deere. We have rejected plaintiff's remaining assignments of error insofar as they pertain to the negligence claims and, therefore, affirm the judgment as to those claims against Deere and Ramsey-Waite. To the extent that those remaining assignments of error bear on the products liability claim, we adhere to our previous ruling rejecting plaintiff's sixth assignment of error, but otherwise decline to address those assignments of error because the evidence may develop differently on retrial. As to the cross-assignments error, we reject the first and second, and decline to address the third because the evidence may develop differently on remand.

Products liability claim against defendant Deere reversed and remanded; otherwise affirmed.